Your Honor, I'm Jay Waldron. I will be the primary person. Mr. Leahy will have some brief comments on behalf of the tribal entities. Okay. You watch your own time. Thank you. Thank you for the opportunity for our argument. I represent 21 consumer and publicly owned utilities, ranging from Blachly-Lane Electric Co-op down in Lane County to Seattle City Light. We're challenging the decision of the Bonneville Power Administration to sell firm power from its federal system to the direct service industry, such as Alcoa. This decision was announced for this service on June 20, 2001. The standard of review is arbitrary and capricious, or contrary to law. This is both. In plain English, this case is about a very clever end run around two statutes and one Supreme Court decision. The statutes are the Bonneville Project Act of 1937 and the Northwest Power Act of 1980. The Supreme Court case is Alcoa v. Central Lincoln. The 1937 act gave preference and priority for the federal power system to publicly owned utilities such as my clients. The Northwest Power Act emphasized this preference and priority at 16 U.S.C. 839 C, subsection A, when it said, all power sales under this chapter shall be subject at all times to the preference and priority provisions of the Bonneville Power Act. And if I may take a moment. Is BPA wrong when they say that that deals with sales but not rates? I would. There is an argument that it also includes rates, but we're not here to talk today at all about rates. And I will answer that question more fully if I may just take a moment to give you some background, because what I what I am arguing, Your Honor, is allocation of power. As someone commented, I do this over 20 years since I argued the Alcoa case before the Ninth Circuit. In 1980, BPA had no more federal power to serve the direct service industries. So they went to Congress and a one time exception was carved out in the legislation to the preference for publicly owned utilities. The language was set forth in 16 U.S.C. subsection D, et cetera. And it says the administrator is authorized to sell in accordance with this subsection. The electric power to the DSIs and those sales must include reserves for from power load. Then, in accordance with this section, what Congress did is say that the these initial contracts, it's only these initial contracts could be offered to the DSI. And finally, it said they had to be in the amount of power of the DSI or the industry's contract from 1975. These were very specific. Alcoa, which revolved around a different issue about interruptible power, said in 1984 when referring to the initial contracts that Congress presumably included 5D1B. That's the section I just referred to, because it wanted to achieve an allocation of power that differs from the allocation by preference. So that was the 1980 statutory exception. And in note 10, which I think is very key to this case, the Supreme Court said to say that the preference provisions do not apply to the initial set of contracts does not make preference meaningless. As was the case prior to the Regional Act, preference continues to govern the allocation of all power that is not committed by contract. Thus, the preference rules will apply to any subsequent contracts made with the DSI. That was Bonneville's view in 1998. I'm very strong on the fact that having experienced it in Alcoa, that Bonneville is not entitled to deference here from a longstanding interpretation of the statute. Just the opposite. In December 1998, after a formal – I have two things to say in terms of the sequence of the argument. First of all, is this argument essentially the one that you made in your reply brief, which amounts to the notion that the allocation to the DSIs under this provision of the statute was just impermissible? Yes. Did you raise that before the reply brief? Yes, we raised it in the opening brief. I was seeing it there. I thought it was an interesting argument, but it seemed to be coming out of the blue. Well, what we argued in the opening brief was that there was competing applications for preference. Bonneville – and we also argued that below. And what happened in Bonneville then came back in their brief and argued that they emphasized the discretionary authority they had out of – and took Section 5D out of context. They only took one portion of it instead of the entire subsection. And that's where we quite candidly, Your Honor, honed our argument on Section 5D, which I will address. All right. And the next question is, at some point, be sure to address the jurisdiction questions. I will. I obviously was expecting you to grill me on that. I'm not going to take your argument over, but you should. Please do. I will get to it. Let me just finish. In 1998, the first time through, Bonneville had a process said that they could only provide interruptible service power to the DSIs, not firm power. And BPA only has this surplus power after it satisfies all its obligations to its preference customers. And that determination is in the record at Excerpt 15 and 16. Then in May 2000, BPA reiterated this point in its first record of decision that it has no obligation to the DSI load and stated at the record at page 105, if Congress had intended to mandate service by BPA to the DSIs after the termination of the initial long-term contract on September 30, 2001, it could have included the DSIs as a preference customer under Section 5A. But Congress didn't. So here's what happened. The DSIs were entitled to first initial contracts in 1980. That was an exception for preference. It comes up to 2000. They don't have an exception preference to get the firm power from the federal-based system. They could have gone to Congress again and carved out a second exception. They also could have developed their own resources, as was envisioned in the legislative history of the first of the Northwest Power Act. They didn't do that. Instead, between 1998 and 2000, they went to the Secretary of Energy, and then BPA changed its views on how to serve the industry. This was contained in the record at page 112. And that's my argument that this Court should defer to Congress, not to BPA. So let me explain BPA's reasoning briefly, and then I'll get to the 5D and the jurisdiction. BPA, what it did then is say suddenly, I would argue, that it has discretionary authority to serve the DSIs. Therefore, it can enter into power sales contracts with the DSIs. Then it forecasts these power sales contracts as loads. Then it purchases power to serve these loads by replacing losses in the federal system. And finally, when it replaces these losses, it determined it could melt these costs of purchases into the preference costs, which is the rate argument. But we are not arguing the rates. We're arguing the allocation. What we're arguing is if BPA had 25 cutting horses, and it also went out and bought 25 saddle horses, and it melded them together, we were entitled to the 25 cutting horses, not 12 1⁄2 cutting horses, 12 1⁄2 saddle horses, which was what they did in this case. And here's how I think that BPA's logic violates the Northwest Power Act. Not once, but six different ways, and I think they're very straightforward. First, it doesn't... This is somewhat related to the jurisdictional question, but isn't this all matter ultimately for rates reasons and not really for any other reason? No. One other reason doesn't matter? The reason that it isn't is because I can take... I will take you through the preference and how this works, but because we're entitled to the cutting horses first, to make my bad analogy. But you're getting all the power you want, right? No, we are not getting all the power we are entitled to from the federal-based system, from the federal resources. You're getting all the power you want, and the only question is how much you're going to have to pay for it. That's not accurate, Your Honor. That's BPA's argument. That is not correct on the facts. Tell me why. Okay. Should I continue my argument? Go ahead. All right. First, it doesn't have discretionary authority under Section D1. That section is that one-time exception to public preference, and it's only for 1980. If they had that discretionary authority, they wouldn't need all the language in 1980. They could have done it this way in 1980. And so our argument is that BPA, first of all, can't sell anything from the federal system to the DSIs under Section 839CD1. Our second argument is, and this is why I think BPA or I would argue to you that BPA jury-rigged this, because if they go under that section, then the contracts have to provide reserves, and they have to provide reserves to meet long-term power outages. It is not for their transmission system, as they came up with in their reply brief. It is to protect the loads of the preference customers, not the transmission system. That's in the legislative history. It's in ALCOA. And they simply forgot, and that's my argument. Which provision are you referring to now? I'm referring to Section 5D1 of Section 839. The reserve provision. I see. Okay, go ahead. For firm power loads. Okay. They didn't put that in the direct service industry contracts. But they went on beyond that. This section also requires them to sell the same amount of power that the DSIs were entitled to in 1975. They didn't put anything in the record about that amount of power corresponding to the statute. The fourth thing is, and this is to the heart of what you just asked me, Your Honor, about did we get all the power that we need. The federal-based system, as defined in the Act, is the Columbia River dams, pre-1980 contracts, and the resources acquired by the administrator an amount necessary to replace the reductions in capability of those resources. It's right out of the statute. That argument I don't find very persuasive. They ignore necessary. Instead, they simply went out and bought, said we've got a contract with the DSIs. As I understand what they're saying, it's necessary to get the SPS back to what it was before. The only reason, well, here's the flaw in their logic. They say they have, they claim they have discretionary authority to sell to the DSIs. And then by that discretionary authority, they suddenly make that necessary to acquire power for the federal-based system. That logic does not work. They wouldn't have needed the Regional Act in 1980 if they had discretionary authority to sell federal-based system power to the DSIs. They can only sell federal-based system power to the DSIs after they have met all the needs of the preference customers from the federal-based system. And that brings me to my fifth point. Even in their own reasoning, in their own record, they said that the amount of power to replace that was available to replace the reductions was 2,669 megawatts. They then projected that they were going to purchase over 3,200. That's in the record of decision, including 1,400 for the DSIs. They're well over. This is the record at page 81, also the record at page, excuse me, our brief at page 19. That's a fifth reason why I don't believe that they complied with that section. And there's a sixth reason. There were, contrary to what they assert, competing claims for power. This is in the record at page 112. After the first proceeding, we wanted federal-based power that was in excess of what was available. Then the DSIs were on top. What they did is meld them and give the DSIs power from the federal-based system. So my argument is on the allocation. My argument goes right back to the analogy of the cutting horses. We didn't get the first 25 cutting horses, and then they go out and purchase 12 other horses or 15 other horses for the DSIs. Instead, they gave the DSIs 12 of those cutting horses and us 12 of them, because they said they had the discretionary authority to purchase for the DSIs the other horses, and they just moved them into the big pot. That's what our principal dispute is here. As a practical matter, and I may have missed some of what you were saying, the non-rate consequences of this are that the contract should have had reserves and they didn't. That's one. Yes, Your Honor. And what else? Well, the first consequence is they had no authority. They can't point to any place. It would really be helpful to me if you separate out the things that could, leaving aside the jurisdictional question, the question of whether they're counting you as getting SBS electricity or some other kind of electricity is something that can be dealt with at the rate proceeding, or at least it has a rate consequence, let's say that. Very much I agree with that. They have focused on the consequence. It doesn't seem to have any other consequence, because it doesn't seem to be related to whether you're going to get the power. But it does have another consequence as to whether they have to have reserves or not. That's one consequence. Okay. The first consequence is the federal base system is a certain amount of firm power. There is a potential consequence if they go out and purchase and serve us with that power, depending, for example, they purchased a great deal of it, it's not in the record from Enron. So we may not get that power. That's the first consequence. The second consequence is it provides no reserves. The third consequence is they violated the statute in their own regulations in what the amount they purchased. So those are my arguments that that go along that line. They have no authority to begin with. And even under their arguments that they had authority, they did it wrong on jurisdiction. They say we're either too early or too late. Okay. The first phase of the rate case, as we've quoted in our brief, said it would address DSI service. We participated in that. We fussed and challenged that. This was in the first proceeding. Then while that proceeding was ‑‑ while we were challenging, they suspended that proceeding. And while that proceeding was suspended, with our challenge existing, they then entered into private contract negotiations with the DSIs, and they signed contracts with the DSIs on October 31st, which we clearly knew about but had never seen them. If we would have sued at that point ‑‑ Ordinarily. I don't know if it isn't ordinarily under the statute. But would the signing of a contract be a final action that is reviewable in this court? Well, that's a ‑‑ Or is it a routine matter? I mean, every time they sign a private contract, does somebody else get to come to this court and complain about it? I would argue there have been cases where the BPA has argued that that's a final decision. I would argue to you that if we had come here on December 1st, BPA would say, no, that's not a final decision, and we would have been facing the same issue because we still have the second phase of the proceeding, which they initiated December 12th and which concluded on June 20th. And I can cite language from the first proceeding in which they said DSI service was at issue and from the second proceeding in which they said all the issues in the first proceeding are in the second issue. We have cited that in our brief, and I can read you the very language. So if we would have sued during the first proceeding ‑‑ Do you think that there was actual language when they announced the supplemental proceeding? Yes. As opposed to some technical problem with regard to the nonfinality of the earlier rate proceeding because they're now going to change it. I mean, it seemed to me that on the first point they had some pretty good arguments because there was real direction as to what the second proceeding was supposed to be. I strongly disagree. The first proceeding said BPA does not intend to conduct a separate public process about the contract. Therefore, parties to the rate case may raise and discuss any issue regarding BPA's proposal to serve the DSIs. We raised that. Well, that's certainly true with regard to the main one. But what about after that? Now, the second one was not a new proceeding. That's what I said. In other words, it seemed to me a better argument is that it's just technically not a new proceeding. Right. We challenged that at that point. Then they suspended it as it went to FERC. Then they reinitiated and they said the second proceeding, the scope of the second proceeding is limited. I'm reading from the supplemental record at page 55. Only by those guidelines the administrator established during the first phase of this proceeding. So it was still open. We had our pending challenge to the first phase. That was suspended. And then we challenged the second phase. Our second argument on that, and it has a lot to do, I believe, with behavior in a sense. And by that I mean my own. They signed these contracts on November 1st. We started Freedom of Information Act requests immediately thereafter. And this gets almost into Never Never Land. It took us eight months, two Freedom of Information Act requests, just to see the DSI contracts. I could not have filed the challenge, I wouldn't feel ethically, until I had read them and understood how they were addressing the federal-based system in those DSI contracts. I have no idea why BPA chose to be complicated and why it took two Freedom of Information Act requests, why we didn't see the first DSI contract even redacted until June 26th, and the first one with very few things so we could use it until July 12th. They did send us copies, as is in the record, and there's only a single affidavit on that to Mr. Peters, our expert, and they were electronically garbled. And he immediately claimed to BPA that he could not read these. One of the reasons I ask the question of whether the contracts themselves could be a final order that could trigger review, because ordinarily how would you even have the contracts? They're not negotiated on the record and they're not signed on the record. And how in general, outside this particular proceeding, does the fact that A has signed a contract with B and what's in it get to C so that C can raise it? Well, the argument would be that either when we are able to see the contract and then challenge it because the provisions violate the statute, or our second argument, which we cited a case, the Peterson v. Highland Music, is when the contracts are implemented. Because if it's an illegal contract at the outset, they can't continue to use an illegal contract. I think my strongest point, besides the legal arguments that I'd like to close with on the jurisdiction, is we did not sit on our hands. I mean, back to 1980, I was part of the 90-day legislation in Congress to have things from the BPA go within 90 days to the Ninth Circuit so that there would be no delay. When the first proceeding ended, we challenged it. Then when the contracts were in our hands so we could see the provisions, we challenged it. When BPA concluded its first phase with its second phase in June, we challenged it. We did not sit on our hands in any way here. BPA is not a used car dealer from 82nd Avenue where, if I'm a pro bono person like I do sometimes, where I have to chase the contract forever. They're a federal agency, and we are their biggest customers and their preferred customers. Thank you. Thank you. All right. There. Definitely have time. May it please the court. Good afternoon. Good afternoon, Your Honors. I know we've been here a while, and I have a lot to get to in a short time. I'll get to the point. My name is Kirk Cassatt. I'm representing Respondent Bonneville Power Administration. I'd like to reserve five minutes of my time for Respondent Intervenors, the Direct Service Industrial Customers of BPA, or the DSIs as we call them for short. First, I'd like to address jurisdiction. Petitioners have raised two separate claims here. One is rate making. One is a challenge to BPA's contract with the DSIs. How do we know there's a rate making challenge? Let me quote from their brief at page 31. They're challenging BPA's, quote, decision that preference customers would pay for the market purchases of power to supply the DSIs instead of paying the cost of the FBS without those power purchases, end quote. The FBS they refer to is used for two purposes in the Act. First, in the event of insufficiency. That's not an issue in this case. Second, rate making. If you hear FBS, you're hearing rate making. With regard to jurisdiction, now is not the time to review rate making challenges. This Court in many, many cases has established that one cannot challenge BPA rate making until FERC, the Federal Energy Regulatory Commission, has granted final confirmation and approval to BPA's rates. And that's true with regard even to what I gather is a rather large number of issues that are not reviewable by FERC. That's correct. So petitioners agree with us that the Court lacks jurisdiction to address rate making issues and they're trying to characterize these as non-rate making issues. However- All right. Well, usefully, Mr. Walter did give us a specific list of things that he thinks are not rate making or non-rate making consequences of the, I guess what was called the compromise approach or whatever. As I have them written down there, the amount that was actually purchased, the consequences of what is the power that's brought us bad power, and the third is this problem about the need for reserves. Your Honor, we agree with them that there are contract issues. We're not arguing that all the issues- So you're just calling them contract issues? Pardon me? So you're calling the same things contract issues? No, they're rate making issues, which are issues related to the FBS, allocation of FBS resources, forecasts of DSI loads, forecasts of preference loads. All those are rate making issues. Contract issues are separate. Contract issues. Does BPA have the authority to sell the DSI's power? Do those power sales violate preference? Are reserves properly handled? Those are contract issues. And we've drawn a bright line in the brief. It's very easy to distinguish- But you're also trying to make that bright line also divide the whole FBS issue on one side and everything else on the other. And that's really the question. It isn't necessarily so. The FBS issue, as I said, is solely a rate making issue. Well, that's what I'm questioning you about. Why is that true? Okay. BPA does not sell FBS power as an allocation to its customers. BPA is different than all the other power marketing administrations. Other power marketing administrations have a finite amount of resources, and they allocate that power to their consumers. Preference customers first, of course. We're a public agency, too. But BPA is different. In the Northwest Power Act, Congress gave BPA the ability to acquire resources to meet its loads, not just preference loads, industrial and utilities, direct service industries also. So you see, what we do, and as your Honor pointed out correctly, they received all the power they wanted. You were correct when you said that. In fact, it makes you wonder, who's getting harmed here? Because they have all the power they want, and the rates they're challenging, they're losing out on the challenger. They don't have all the power they want at decent rates, though. And that's right. And as this Court has held three different times, preference does not apply to rates or prices. This Court has held three times it applies to power, not price. In a real world, they are intertwined with scarcity, aren't they? You have the scarcity, then you have the rate movements. If there's ever any scarcity with power supply, they get served first. That's a rule we always respect. There's never been any problem. I wish that were true. Pardon me? I wish that were true. Well, it is true, Your Honor. I'm a customer of one of those preferred. And I watch my rates just going up every six months or so. That's correct. Your rates have gone up. But they've always had access to the federal-based system costs. And those costs are our lowest costs, even with additions that replace reductions of the capability. I would rest more easy with this argument if I had some assurance that when they come back on the rate issue, you're not going to be arguing such that you're going to start cutting off issues that derive from SBS allocation questions, but end up as rate matters. No, Your Honor. For example, there's an argument on Pages 54, 5, and 6, I think, of your brief about what 839EB1 means. That seems to be definitely a rate question, but it deals with how you allocate for rate purposes the SBS system resources. You're making assertions here that it's all unitary, and maybe it isn't all unitary. That statute sounds to me like maybe it's not all unitary. If those questions are going to be open at the rate-making proceeding, then I'm less concerned about the jurisdictional question. But if you're going to turn around later and say, oh, no, no, that was by the boards because it should have been raised earlier, the real question is here, how are we going to be sure that one way or the other the questions can be raised? We have stated, and we are glad to be held to this, all the rate-making issues regarding allocation of SBS costs, et cetera, are properly reviewed by FERC to the extent they regard our cost recovery. And concluding the question about whether you're right that there's only a unitary SBS rate as opposed to the possibility that you could allocate, that the public entities have first called for rate purposes on SBS resources. Okay. Any issue regarding the SBS is solely an issue of price and cost. Okay. Rate-making allocates SBS costs. You can look at any contract we have. It doesn't say we're selling you SBS power. It doesn't say that because we don't do that. We do sell from a melded system. We sell everyone federal power, and that federal power is comprised of all of our resources. The SBS only comes into it in terms of rate-making because those are our lowest-cost resources. Even if we replace reductions in capability of those resources, those are huge, 8,400 megawatts. Our replacements are only 1,200. They still get the price benefit of having those costs allocated to them. Now, while they could overpower it. You're saying they should have more of a price benefit because they should be getting the allocation not on a melded basis. Is that issue going to be open at the rate proceeding? The issue on, yes, the impact of them on rates, on their rates, from the fact that we acquired power to replace reductions in capability and increase the average price of the SBS, absolutely, that's a rate-making issue. No question. In effect, they would be paying a higher rate because of the fact there is melded power with it. Yes, and they should, Your Honor, and that's an appropriate result. But whether there is or isn't, it will be open at the rate proceeding. Yes. Any issue that affects, that involves the allocation of SBS costs and other costs and affects what they pay will be addressed in this court upon appeal from the FERC order. FERC doesn't have jurisdiction over rate design or cost allocation, only revenue recovery. The other issues come, as you mentioned, directly to this court. This court will review those issues. Now, with regard to the contract jurisdiction issues. Just one thing. At what point does that determine that since we do obviously have some very big, more expensive power, at what point is that rate determination made? Do you oppose the rate? Or would you say FERC can't really set the rate? We hold a hearing, Your Honor, a formal evidentiary hearing, as we did in this case. And all these issues are litigated as they were in this case. And then BPA issues a record of decision along with rate schedules. And BPA files those with FERC for approval. FERC has limited jurisdiction, but this court cannot review those until FERC grants final approval, because then all the rate issues go up at once to this court. And thus far, you have not had that hearing with regard to rates. We have had the rate-making hearing, Your Honor, where we established our rates, and we allocated the costs, and we have those rates, and we filed those rates with FERC. FERC, however, has not yet granted final approval that would give this court jurisdiction. And those rates did, from that hearing, from the hearing we had already, that differentiation was made between those who are using the merged tolerance as opposed to FERC customers. But all the issues regarding the allocation of costs from the FBS, other resources, are addressed in that rate case. That's correct. That's what is before FERC. That's correct. Those rates are before FERC, Your Honor. Okay. Pardon me. So then with respect to jurisdiction over what you're calling the contract. Yes, Your Honor. It seems to me that there are two or three possibilities. One is that the supplemental proceeding made the earlier proceeding non-final. I mean, what is that? You say they should have filed within 90 days of the May rod, right? No, no, no, Your Honor. They should have filed within 90 days of October 31, 2000, when BPA executed all the DSI contracts. And they didn't have the contracts, did they? Does that matter? It doesn't matter, Your Honor. Why? They knew that BPA executed those contracts in October of 2000. Page 2 of their affidavit of Lon Peters says, and I can quote the violation. I know they knew they executed them, but I didn't know what was in it. Your Honor, they're arguing, as you pointed out in their reply brief, and as Mr. Waldron said in their initial brief, that BPA lacks authority to sell to the DSIs. If there's any sale, what's there? That's part of what they're arguing, but they claim that. Wait a minute. Your Honor, we made available copies of prototype DSI contracts to them and asked them for comments. They said that those prototypes were at a time that you had an earlier theory about how things were being done. That's. I mean, that's what they said. They claimed that those contracts were at the time that you were selling surplus power. I didn't read the brief, so you could tell me why I'm wrong, but I didn't say what's in it. Sorry, Your Honor. There have been so many misstatements of fact we've had to deal with. This has been very difficult. Let's go back to this concept you just mentioned. BPA rejected the sale of surplus in its power subscription strategy, said it wouldn't sell surplus to them. Right. It said, well, we might come up with a new surplus concept. But two pages later, BPA says, because we haven't decided how, we know there might be a number of ways we could do it. And one of those we've listed, it's in the record, is augmenting the system to sell them power. We've said that. Right. They knew that. But how can you write a prototype contract that doesn't depend on what you ultimately decide? Is that the point at which the prototype contract was out? Yes, the prototype contract came out after that, Your Honor. But before any decision had been made about what you were actually going to do. The prototype contract didn't address how much power we would sell. It had more of a generic. Or where it was coming from or anything like that. No, that was addressed, as I said, it was addressed that we would augment to sell BPA. Are you saying that those prototype contracts are not very informative because they're not contracts based on what was ultimately decided? Let's assume that. Let's assume that. Okay. Let's go then to the rate case where we included the compromise approach. As they said in their brief, the compromise approach had the amount of power we were going to sell to the DSIs, the rates that we were going to sell at, remarketing provisions, on and on and on. All those details were addressed in the rate case. There aren't rate making issues. We wanted to get public input on our proposal to sell to the DSIs. So we put it in this formal evidentiary context, even though we didn't have to, and we got all this information and review of all those terms on how we would serve the DSIs. And the May rod, May 2000, said, okay, we've heard everything. We're going to go ahead with the compromise approach. What did we do then? We started negotiating with the DSIs. We signed all their contracts, October 31st, 2000, filed within 90 days. Even if it's a rejected filing, file within 90 days. Suppose at that point you had signed one on August 1st and one on August 15th and another one on September 1st and then they have separate filing days for each contract? BPA sent a letter out. This is in the record, Your Honor, on August 31st, 2000, to all of its customers. BPA had suspended any contract signing. In other words, what I'm pointing out, Your Honor, is that the record shows between September and 5th and October 31st the contracts had to be signed, and Petitioners admit they knew the DSI contracts were signed in October 2000. They said that in their affidavit, and the record also shows that. The record, the BPA Journal, November BPA Journal, sent to all of our customers, said we've sold this amount of megawatts to the DSIs under contracts executed by October 31st. Also, our December 1st, 2000 Federal Register Notice starting the supplemental rate case. Again, BPA has sold power to all of its customers, including the DSIs, by October 31st. They knew those contracts had been executed. They should have, as is very common, filed a protective petition for review with this court. Unfortunately, they should have filed several protective petitions because it's very hard to figure out what they should have done. But I'm still having problems with the notion that they should have filed review of a contract they didn't see and asked for it didn't get. It's difficult. Your Honor, I think that you can look at the claims that they're making. The major claim is a preference claim. There is no preference. But why didn't you just give it to them? You want them to appeal it. Your Honor, I did not work on the FOIA response, but I did go back. If I'm a client, I go to a lawyer, and I say, should I file an appeal from this contract? He says, well, show me the contract, and I'll tell you whether you have any legal arguments. I don't have the contract, but they won't give it to me. Then what? Well, it would have been nice if they had gotten those immediately. What they didn't mention, I don't think, is when they asked for their first FOIA request, they didn't ask for the DSI contracts alone. They asked for every subscription contract we had just completed, about 150. The first time we got a set of contracts to them, we gave them about 130. The next time we gave them about 15. The next time we gave them a few more. And also, if you go back and look at the events of the FOIA, when they contacted us, we responded within one day, two days, three days. And sometimes there would be gaps of time before we got them the contracts. That would be weeks. But we were always in contact with them. Another question is, were these contracts really final? They were final on October 31, 2000. Was that not amendable or could that not be withdrawn from? Wasn't there a letter written saying that because the rate proceeding wasn't done yet, it was very odd people were signing contracts for rates that weren't finished yet? That is a fallacy, Your Honor. Your Honor, BPA knew it had to sign contracts by October 31st. The only place we were looking for comments on the VSI contracts and the compromise approach was in the May 2000 rate case. And so we knew we had to get the contracts signed. Therefore, we had to get comment done in that rate case. So October 31st came, all the contracts were signed. The law requires that all the contracts BPA has are binding on their terms. We cannot unilaterally change a contract. Now, in December, over a month after the contracts were signed, we started a supplemental rate case to address a financial problem. But the contracts had already been signed. The Federal Register notice didn't even mention VSI contracts or the compromise approach. How could we? We already signed the contracts. It was just a rate-making proceeding. The only party that brought up VSI service was petitioners. Nobody else did because the contracts were done. We couldn't have addressed it. Okay. You have about two minutes. I'd like to provide some time to respond to the interviewers. Thank you very much for your time, Your Honor. Yes. We'll give him four. How about that? Thank you, Your Honor. First, the sense of what did the petitioners know. They knew that the contracts had been signed. They knew that they'd been signed in a relatively short window of October of 2000. More importantly, they knew the substance of the contracts insofar as it relates to their specific contract claims. If you look at the prototype contract, which is in the record starting at page 6190, and compare that to the contracts that were actually signed, on all of the points on which they assert contract claims, the contract was already done on those points. For example, on the issue of whether it was a sale under Section 5D of the contract as opposed to a surplus sale. The prototype is clear, as was the final contract, that this was a sale under the IP rate, which is the 7C2 rate that applies to 5D sales, not surplus sales. So they were on notice and aware of that fact. As to the reserve issue, there was no reserve component in the prototype contract. As noted in the brief, they didn't comment on that in the period of time they had to comment on the contracts, nor was this particularly a surprise. In the last DSI contracts in 1995, the contracts that were reviewed and approved by this Court, the APAC litigation, the only reserve provision in there was a similar stability reserve provision. Plaintiffs knew or Petitioners knew that that provision was continued to apply to the DSIs, but because of the unbundled nature of the service, was now available, applicable through the transmission service. Just to clarify, although these are called transmission reserves, they do qualify. They don't just protect the transmission system. What happens is if a transmission line falls down, they interrupt deliveries of power to the DSIs. They take that power and use that power to maintain service to their load. So it is a reserve that provides, that assures Bonneville the ability to provide firm power service to its customers. Is the contracts that provide the rates that were to apply to each of the DSIs? The contracts specify that the rate that will apply to sales under this contract is the industrial power rate, which is the rate that is set in the Bonneville's rate proceeding. Yes. Yeah. Yes. One last thing. So we believe the contract claims are untimely, that the contract was final on October 31st when they were fined. Plaintiffs could have and should have filed a petition for, with this court at that time. They certainly could have attached the prototype contract, if nothing else, and in any event have obtained the contracts through the process here. They chose to rely on FOIA. I don't know why they chose to do that, but they have the ability and the opportunity to bring this challenge in a timely fashion. I want to remind the Court that the reason we have the 90-day statutory provision is Congress was very much concerned about having finality in this process with Bonneville. Congress did not intend to have a situation where people could operate on contracts for some time and have them subject to challenge at a later time. But apparently still the rates can be challenged, right? The rates are not available for challenge until, not right for challenge. So FERC has granted final approval of that. I think the expectation was that FERC would act a little more promptly than they have. But meanwhile, people are paying a temporary rate? FERC has approved them on an interim basis, and those have been collected on that basis for almost two years now. Okay. Thank you. Thank you very much. Your Honor, is my hour up? A minute. Okay. May I also have one minute? I'm sorry? May I also have one minute? Oh, I'm sorry. I thought it was you who were going to ask a question. All right. Go ahead. I'll just key on the very last issue that counsel articulately discussed and try to go through the sequence. May 2000, there is a decision made about DSI service. It was clearly a part of that rate proceeding. We challenged that. And the prototype contracts were a part of that. Then BPA suspended that proceeding. They went to FERC and said, time out. Then they signed, there was some talk in August about what they were going to do, and then they signed contracts on October 31st. We knew about that date. The very next day, we properly filed a Freedom of Information Act request asking for them. We filed a second one. This is like Alice in Wonderland. And at one point, they gave us You actually assumed, though, that the contracts would have the rate in it that was established in prior hearings. I wouldn't assume that. That's my point. I don't want to make this personal, but ethically, I wouldn't feel very comfortable. That's why we filed the FOIA Act the next day so we could see the contracts. I have no idea why BPA at one point gave us all the public contracts and not the DSIs. I have no idea, except what we have in the record, why they took until July 12th to give us contracts. We had never seen them. But at the same time, they reinitiated the May. What about the prototype contracts? And then we'll stop. But what about the prototype contracts? They were part of the May proceeding. The May proceeding was suspended. The May proceeding did adopt the compromise approach, so why wasn't that good enough? Because it was suspended, and then they reinitiated the proceeding, which didn't conclude until Actually, the specific issues that you are now claiming that you want to challenge, those prototypes would have been the same, and they were the same as the contracts. I don't agree with that, Your Honor. We don't have the factual. There's not a factual record developed, but they are not identical. I see. Okay. Thank you, Your Honor. Thank you. Thank you, Your Honors. I appreciate it. May it please the Court, Chris Leighton for the Tribal Interveners. First of all, I'd just point out that 16 U.S.C. 839-FE does provide for review of the following final actions. The following actions shall be final actions subject to judicial review. It includes sales, exchanges, and purchases of electric power. Second of all, I would point out you asked some questions about non-rate consequences earlier. There are other violations of the statute. The reason the tribes are in this case is they intervened because of commitments in these contracts. Isn't the real problem that you didn't file your own petition, and these issues that you're raising now weren't raised earlier? Oh, Your Honor, I think that the issues of committing more load than they had access to and not – Right. You're raising some fishing and fishing water. As a harm, that's correct. That's what I'm saying is another non-rate consequence of over-committing load or not including reserves is the potential harm actually realized already and admitted to by Bonneville of their inability to meet their load commitments. That would be the harm. Thank you very much. Thank you very much. We are in the case of black humane electric forfeit versus IPA. It is admitted that we are in recess.
judges: Goodwin, Hug, Berzon